**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-14473-CIV-MARTINEZ/MAYNARD**

**CHRISTOPHER SCHROEDER,**

      **Petitioner,**

**v.**

**DEPARTMENT OF CORRECTIONS,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION ON PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY [DE 1]

**THIS CAUSE** comes before this Court upon an Order of Reference (DE 4) and the above Petition. The record before this Court consists of the Petition (DE 1), Memorandum of Law in Support of the Petition (DE 1-1), Response (DE 6), Appendix (DE 7), and Reply (DE 8).  Having reviewed the record, this Court recommends as follows:

## INTRODUCTION

Petitioner Christopher Schroeder ("Petitioner"), a state prisoner at New River Correctional Institution in Raiford, Florida, filed a Petition for Writ of Habeas Corpus under 42 U.S.C. §2254 challenging his conviction in the Circuit Court of the Tenth Judicial Circuit, in and for Highlands County, Florida.  Petitioner was charged with burglary of a conveyance while armed with a firearm (Count 1) and robbery with a firearm (Count 2).  DE 7-1 at 2.  The charges arose from Petitioner's conduct on July 3, 2010, when he entered the rear passenger door of a car parked outside of a Walmart store in Sebring, Florida.  DE 7-5 at 39. The owner of the car, Jennifer Sanchez, was sitting in the driver's seat when Petitioner entered with a gun and told her to drive.  *Id*. at 40-41.

When Ms. Sanchez pulled on the car door handle to escape, Petitioner grabbed her arm and again told her to drive. *Id*. at 42. Ms. Sanchez managed to get out of the car and ran towards the Walmart. *Id*. Petitioner went to trial in 2011 and a jury found him guilty as to both counts. *Id*. at 299-300. He was sentenced to life in prison on December 21, 2011. DE 7-6 at 62-63.

## BACKGROUND

Petitioner was arrested on July 3, 2010 and went to trial on November 17, 2011. DE 7-5 at 1; DE 7-17 at 212. During that time period, he was represented by at least three different attorneys.[1] His first attorney – Robert H. Gray – retained Dr. Thomas McClane, a forensic psychologist, to evaluate Petitioner for a motion to suppress, a claim of legal insanity and mitigating arguments at sentencing. DE 7-17 at 227-28. Prior to filing the motion to suppress, however, Attorney Gray joined the Public Defender's Office. *Id*. at 87. That created a conflict for his representation of Petitioner since Petitioner's mother worked at the Public Defender's Office. *Id*. As a result, the case was reassigned to Attorney Michael B. McDermott. *Id*. Attorney McDermott filed a motion to suppress based on Dr. McClane's report and argued the motion at a hearing held on July 27, 2011. DE 7-2; DE 7-3. Thereafter, Petitioner's case was reassigned again, first briefly to another attorney, then to Attorney Leighton G. Morse. DE 7-17 at 90-91. That reassignment occurred about a month before trial. *Id*. at 91. Attorney Morse handled the case through trial and sentencing.

Petitioner's case was also handled by two different judges. Initially, it was assigned to the Honorable Peter F. Estrada. *Id*. at 222. As a result of the court's routine case rotation system, it was then transferred to the Honorable Angela J. Cowden prior to the motion to suppress. *Id*. at 166, 172, 225-26. Judge Cowden presided over the motion to suppress hearing and issued a ruling

---

[1] Petitioner testified that he had a fourth attorney, whose name he could not remember and who was assigned his case for less than two weeks. DE 7-17 at 82.

denying the motion.  *Id*. at 89; DE 7-3; DE 7-4.  Petitioner's case was set for trial before Judge Cowden on November 17, 2011.    DE 7-17 at 248. That week, however, Judge Cowden had too many cases to try, so Judge Estrada agreed to try Petitioner's case for her.  DE 7-17 at 249-250, 298. Judge Estrada presided at Petitioner's trial and sentencing.

Petitioner's Section 2254 Petition requests that the District Court vacate his judgment and sentence on the following four grounds: (1) Petitioner was denied his constitutional right to effective assistance of counsel when counsel failed to file a motion to recuse Judge Estrada; (2) Petitioner was denied his constitutional right to effective assistance of counsel when counsel failed to adequately represent the Petitioner at his motion to suppress hearing; (3) Petitioner was denied his constitutional right to effective assistance of counsel when counsel failed to adequately investigate and present an insanity defense at trial; and (4) Petitioner was denied his constitutional right to effective assistance of counsel when counsel misadvised him about an insanity defense, leading him to waive his right to testify. DE 1 at 1-13.  Since Petitioner's case involved various attorneys handling different stages of Petitioner's case before two different judges, the undersigned will describe each phase as it relates to Petitioner's claims.

**A.  Motion to Suppress**

On July 12, 2011, Attorney McDermott filed a motion to suppress statements Petitioner made to law enforcement officers after his arrest on July 3, 2010. DE 7-2 at 2. The motion alleged that Petitioner's waiver of his *Miranda* rights was not knowing or voluntary because at the time he spoke to law enforcement Petitioner was suffering from hunger, thirst, dehydration, illness, and drug withdrawal.  *Id*. at 3.  Judge Cowden held a hearing on Petitioner's motion on July 27, 2011. DE 7-3. The government called four witnesses: 1) Corporal Vivian Buck with the Sebring Police Department (*Id*. at 9); 2) Sergeant Manuel Gonzalez with the Highlands County Sheriff's Office

(*Id*. at 15); 3) Oliver Steven Worley with the Highlands County Sheriff's Office (*Id*. at 35); and 4) Officer Sean Courtney Bueford with the Sebring Police Department (*Id*. at 44).  Petitioner called Dr. Thomas McClane, a forensic psychiatrist, to testify on behalf of the defense.

The officers testified that Petitioner was given *Miranda* warnings on at least two occasions after his arrest on July 3, 2010.  Sergeant Gonzalez first administered *Miranda* warnings while Petitioner was sitting in the backseat of a patrol vehicle.  *Id*. at 18.  Sgt. Gonzalez opened the backseat door where Petitioner was handcuffed.  He came face-to-face with Petitioner and read the *Miranda* warnings that were written on a prepared card.  *Id*. at 22-23.  After reading the *Miranda* warnings, Sgt. Gonzalez asked if Petitioner understood them.  Petitioner said he did.  *Id*. at 23-24. Sgt. Gonzalez then asked Petitioner if he committed a robbery in a separate case and Petitioner replied, "No, I did not do that one." *Id*. at 31-32. Regarding whether Petitioner appeared to be intoxicated or withdrawing from illegal substances, Sgt. Gonzalez testified that he has been in contact with at least 100 people under the influence or "coming off of drugs." He did not believe Petitioner exhibited signs or behavior consistent with being under the influence or going through withdrawal.  *Id*. at 18-20, 30-31.

Officer Bueford testified that he arrived on the scene and spoke to Petitioner after he had been *Mirandized* by Sgt. Gonzalez.  *Id*. at 47. Before asking any questions, Ofc. Bueford advised Petitioner that he was still under *Miranda* and asked Petitioner if he still understood his rights, and whether he was willing to speak with Bueford.  *Id*. at 47-48.  Petitioner answered in the affirmative. *Id*.  Ofc. Bueford asked Petitioner if the wallet that was found was taken off the victim.  *Id*. at 50-51.  Petitioner said yes.  Ofc. Bueford showed the same wallet to Ms. Sanchez, who confirmed it was hers.  *Id*.

Petitioner was transported from the Walmart area to the Sebring Police station, where Ofc. Bueford *Mirandized* Petitioner again before taking a recorded statement. *Id*. Ofc. Bueford presented Petitioner with a waiver form, told Petitioner that the *Miranda* warnings on the form were the ones he had just read aloud, and asked Petitioner to read it over and sign. Petitioner appeared to read the form and signed it. *Id*. at 52-54. During his interview and subsequent conversations with Ofc. Bueford, Petitioner was responsive and articulate. *Id*. at 55-56. Petitioner told Ofc. Bueford that he had not eaten in two days, was sick all night the night before, was suffering from withdrawal from pain pills, felt lightheaded and his head was spinning. *Id*. at 71. Ofc. Bueford became concerned that Petitioner was dehydrated and called EMS. Ofc. Bueford kept asking Petitioner questions until EMS arrived to take him to the hospital. He felt no need to stop the interview because he found Petitioner's thought processing to be "correct and fine and accurate." *Id*. at 73.

The State played an audio recording of Ofc. Bueford's interview with Petitioner at the police station.[2] *Id*. at 58. Ofc. Bueford started by asking Petitioner some preliminary questions before asking about the incident at Walmart. Petitioner answered Bueford's preliminary questions. When Ofc. Beuford started to delve into what happened in the Walmart parking lot that day, however, Petitioner decided to end the interview. *Id*. at 57-59. Petitioner said he was not trying to be disrespectful, but he did not want to speak to Ofc. Bueford until his head was clear. *Id*. at 70-74. The interview ended at that point. Petitioner was taken to the hospital by EMS. *Id*. at 59-60. At some point while they were at the hospital, Petitioner initiated another conversation with Ofc. Bueford and, according to Bueford, they "had a clear and concise conversation about his

---

[2] The transcript of the recording is not contained in this part of the record. The content of the recording was established through Ofc. Bueford's testimony.

problems." *Id.* at 74. Ofc. Bueford asked Petitioner if he could ask him some more questions. Petitioner responded affirmatively. *Id.* at 61. Ofc. Bueford asked where Petitioner obtained the gun, and Petitioner admitted it belonged to his parents. *Id.* at 74-75. Petitioner was oriented as to time and place, telling Ofc. Bueford at one point while they were at the hospital that he wanted to go to jail. *Id.* at 56. While at the hospital, Petitioner decided to reject medical treatment. *Id.* at 63. Regarding whether Petitioner appeared to be intoxicated or going through withdrawal, Ofc. Bueford testified that he has been in contact with hundreds of people under the influence of or withdrawing from drugs. He did not observe withdrawal or intoxicated behavior by Petitioner. *Id.* at 47-50.

Dr. McClane testified that he reviewed records given to him by Attorney Gray as part of his evaluation of Petitioner. *Id.* at 79. These records included police reports and a letter from Julia Jankowski, a mental health counselor from Tri-County Jail. Dr. McClane also met with Petitioner for approximately 2 hours. Dr. McClane also reviewed the transcript of Petitioner's interview with law enforcement, although he did not listen to the recording. Dr. McClane's diagnostic impression of Petitioner was chronic, severe drug abuse, personality disorder with antisocial traits, probable severe intoxication with methamphetamine at the time of the offense, and ADHD diagnosed in childhood. *Id.* at 79-82.

Dr. McClane testified that he did not believe Petitioner was able to competently waive his *Miranda* rights when he talked to police on July 3, 2010. *Id.* at 84. In his professional opinion, Petitioner was unable to understand and waive *Miranda* because he was likely intoxicated with methamphetamine and withdrawing from oxycodone at the time of the offense. *Id.* at 83, 98. Dr. McClane further testified that if Petitioner had bipolar disorder and/or post-traumatic stress disorder, those disorders likely contributed to his addiction problem, but not necessarily to what

was going on at the time of the offense.  *Id*. at 84.  Dr. McClane testified that Petitioner probably was not competent to waive his *Miranda* rights.  *Id*.

On August 9, 2011, Judge Cowden denied Petitioner's motion to suppress by written order. DE 7-4. Judge Cowden found based on the evidence that Petitioner knowingly, intelligently and voluntarily waived his *Miranda* rights.  *Id*. at 3. She said the recorded interview between Petitioner and Officer Bueford showed that Petitioner was cooperative, responded appropriately to questioning, and his statements indicated that he knew what he was doing.  *Id*. at 4 ("His answers and choices not to answer showed a degree of thought and decision making that was superior and obviously self-serving.").  Judge Cowden concluded, "Based on the evidence at the hearing, whether or not the [Petitioner] was withdrawing from the use of illegal substances, he knew what were his rights, knew how to use his rights, considered the merits of silence versus confession, and chose his words accordingly."  *Id*. at 5.

## B. Trial

Petitioner's case went to trial on November 17, 2011 before Judge Estrada. DE 7-5.  The government called seven witnesses:  1) Christine Daniel Bell (*Id*. at 29); 2) Jennifer Sanchez (*Id*. at 37); 3) Deputy Calvin Wayne Gunn with the Highlands County Sheriff's Office (*Id*. at 78); 4) Officer Thomas Haralson  with the Sebring Police Department (*Id*. at 98); 5) Sergeant Gonzalez (*Id*. at 109); 6) Officer Raymond Rossy (*Id*. at 121); and 7) Officer Bueford (*Id*. at 143).

Mr. Bell testified that he oversaw the Sebring Walmart security system, where the incident occurred, which includes video cameras.  He provided a video capturing the Walmart parking lot between 11:30am and 12:30pm on July 3, 2010. The video showed Petitioner walking past, returning to and then entering Ms. Sanchez's car.  *Id*. at 52, 55.  It also showed him getting out of the car and running north, out of the parking lot.  *Id*. at 29-33.

Ms. Sanchez testified that she was sitting in her car in the Walmart parking lot when Petitioner opened the back door and entered the vehicle. She told him that he had the wrong car. When he did not say anything, she looked and saw that he had a gun in his lap and it was pointed at her. Petitioner told her "I just need you to drive." *Id.* at 38-41. Ms. Sanchez testified that she made a conscious effort to look at his face and the gun so that she would be able to identify them later. *Id.* at 41-42. She then pulled on her car door handle to escape. Petitioner picked up the gun, grabbed her arm and again told her that he needed her to drive. Ms. Sanchez opened the car door and ran out with her car still running. *Id.* She turned around as she was running away and saw Petitioner was running in the opposite direction. *Id.* at 55. She approached a woman who dialed 911 for her. A Sebring officer arrived shortly. *Id.* at 42-43. Ms. Sanchez described the man who got into her car as a white male, in his twenties, of medium height and build, dark hair, hazel eyes, and scruffy beard. He was wearing a gold shirt and baggy jean shorts. She also described the gun used. *Id.* at 44. Ms. Sanchez realized that her wallet, which had been sitting on the passenger seat of her car, was missing. *Id.* at 46-48. Once officers found a suspect, that is, Petitioner, they asked Ms. Sanchez if she could identify him. She instantaneously recognized him as the man who got into her car. *Id.* at 44-46, 107.

K-9 officer Dpt. Gunn testified that he responded to a request to use his canine, Sarge, to track and locate a suspect near the Sebring Walmart parking lot on July 3, 2010. *Id.* at 85-86. Sarge was given the gun, which was found on the floor next to Ms. Sanchez's car, to track the suspect. The gun was loaded. *Id.* at 101, 124. Sarge tracked the scent north of the Walmart parking lot to the parking lot of a nearby bank. *Id.* at 88-89. He then led Dpt. Gunn and another officer to a dumpster. A man who matched the description given by Ms. Sanchez came out from behind the dumpster with his hands up. *Id.* Dpt. Gunn identified Petitioner as the man he found

by the dumpster. *Id*. A black wallet was found in the dumpster. *Id*. at 90-91. Ms. Sanchez recognized the wallet as hers. DE 7-17 at 190.

Ofc. Bueford testified that he was present when Petitioner was located by the K-9 unit. He searched Petitioner and found cash and receipts for movie tickets belonging to the victim. DE 7-5 at 144-47. After Petitioner was taken to the police station, Ofc. Bueford gave him his *Miranda* warnings and took a taped statement from him. *Id*. at 148-151. Petitioner was subsequently taken to the hospital where he refused treatment. *Id*. at 173.[3] At the hospital, Petitioner admitted to Ofc. Bueford that he had taken the gun from his parents' house. *Id*. at 174.

After the State rested its case, Judge Estrada addressed Petitioner in open court. *Id*. at 192. He asked Petitioner if it was correct that he did not wish to call any witnesses on his behalf, offer any evidence, or testify in his own defense. Petitioner said yes. Judge Estrada asked Petitioner if he understood that it was his right to offer evidence and testify. Petitioner said yes. Judge Estrada also asked if Petitioner understood fully the decision he was making not to testify, and Petitioner said yes. *Id*. at 192-94.

The jury found Petitioner guilty of on both counts. *Id*. at 299-300.

## C. Sentencing

A sentencing hearing was held on December 21, 2011. DE 7-6. The maximum penalty for the crimes charged was life imprisonment. *Id*. at 6. The presentence investigation report indicated that Petitioner had a previous conviction for burglary of a dwelling while armed with a firearm in 2000. *Id*. at 3-6.

The defense called several witnesses for mitigation purposes. These included: 1) Charles May from Tri-County Human Services who ran the substance abuse program Petitioner entered in

---

[3] The taped statement was not actually played to the jury. *Id*. at 168.

August 2010 (*Id*. at 15);  2) Julia Jankowski, a counselor from Tri-County Human Services who performed a mental health evaluation on Plaintiff in February 2011 (*Id*. at 26); 3) Trisha Drawdy, Petitioner's ex-wife (*Id*. at 276);  and 4) Darlene Teague, Petitioner's mother (*Id*. at 40). Petitioner then made a statement to the court. *Id*. at 48.  Petitioner apologized to the victim for the pain he caused.  Petitioner explained that he was a decent man who made a mistake, as he hoped the earlier testimony had revealed.  Petitioner asked the court to sentence him to a term of imprisonment to be followed by mental health and substance abuse treatment. *Id*. at 50. Ms. Sanchez also made a statement to the court. *Id*. at 52. She asked Judge Estrada to give Petitioner the maximum sentence to prevent him from entering another car and holding another person at gunpoint. She questioned whether Petitioner would actually obtain the help that he needed if released. After considering the testimony, statements, and presentence investigation, Judge Estrada sentenced Petitioner to life imprisonment on both counts.  *Id*. at 65.

### D.  Rule 3.850 Motion and Evidentiary Hearing

On December 17, 2014, Petitioner timely filed a Motion for Postconviction Relief pursuant to Florida Rule of Criminal Procedure 3.850[4], raising seven ineffective assistance of trial counsel claims and one claim for cumulative error.  DE 7-16.  Petitioner was represented by current counsel Attorney Rachel E. Reese.[5]  Claim One alleged that trial counsel was ineffective in failing to properly address the conflict with the presiding judge (*Id*. at 8-10). Claim Two alleged that trial counsel was ineffective for failing to investigate Petitioner's mental health and for failing to seek

---

[4] Fla. R. Crim. P. 3.850, entitled Motion to Vacate, Set Aside, or Correct Sentence, provides a vehicle for collateral review of a criminal conviction.  *Duncan v. Walker*, 533 U.S. 167, 177 (2001).  Florida generally requires defendants to raise ineffective assistance of counsel claims in these postconviction proceedings rather than on direct appeal. *Reynolds v. State*, 99 So.3d 459, 474 (Fla. 2012) ("claims of ineffective assistance of counsel generally are not cognizable on direct appeal and are properly raised in postconviction proceedings").

[5] Attorney Reese's last name was Bushey when the 3.580 motion was filed.  The undersigned uses her current name—Reese—throughout this Report and Recommendation.

a competency hearing (*Id*. at 11-12). Claim Three alleged that trial counsel was ineffective by failing to adequately represent Petitioner at his motion to suppress hearing (*Id*. at 13-15). Claim Four alleged that trial counsel was ineffective by failing to adequately investigate and present an insanity defense (*Id*. at 15-17). Claim Five alleged that trial counsel was ineffective for improperly advising Petitioner about an insanity defense, causing Petitioner to waive his right to testify (*Id*. at 17-18). Claim Six alleged that trial counsel was ineffective by failing to ask the trial court for a downward departure and for failing to offer mitigating evidence at Petitioner's sentencing hearing (*Id*. at 18-20). Claim Seven alleged that trial counsel was ineffective by failing to fully represent Petitioner during his sentencing hearing (*Id*. at 21-23). Claim Eight alleged that the cumulative effect of trial counsel's errors rendered his assistance ineffective within the meaning of *Strickland* (*Id*. at 23-24).

An evidentiary hearing was held on November 18, 2016, before Judge Michael E. Raiden. DE 7-17.  Attorney Reese represented Petitioner at the evidentiary hearing.  Assistant State Attorney Heather Beato appeared on behalf of the State.  At the hearing, Petitioner called three witnesses: Darlene Teague, Trisha Drawdy, and James Buddy Hall.  Petitioner testified as well.

Petitioner presented testimony about why he did not want Judge Estrada to try his case. Petitioner testified that he was first arrested in 1998 at the age of 15 and charged with criminal mischief for spray painting someone's property.  *Id*.  at 91-93.  Judge Estrada, then an Assistant State Attorney prosecuting juvenile cases, was assigned to his case.  *Id*.  Adjudication was withheld, and Petitioner participated in a juvenile diversion program.  *Id*.  at 95-96.  Two years later, in 2000, Petitioner was arrested again, this time for armed burglary.  *Id*.  at 92-94.  Petitioner testified that Judge Estrada again was the assigned prosecutor.  *Id*. at 95.  Petitioner was shocked

and fearful when he learned that Judge Estrada would preside over the criminal trial because Judge Estrada had prosecuted him ten years prior. *Id*. at 96.

Petitioner's mother, Darlene Teague, testified that she first met Judge Estrada around 1999-2000 when he was teaching one of her community college classes. *Id*. at 11. During breaks in class, Ms. Teague would occasionally talk to Judge Estrada, then an Assistant State Attorney (ASA). *Id*. at 12-13. When her son was arrested in 2000, she asked then ASA Estrada what could happen to her son. He was reluctant to speak with her. *Id*. Ms. Teague estimated that she spoke to Judge Estrada about Petitioner's case four or five times in 2000 but could not remember any further details about their discussions. *Id*. at 20, 32-33, 38. When she learned Judge Estrada was presiding over her son's case in 2010, she initially believed it might help her son. *Id*. at 14. She then became nervous that Judge Estrada knew personal things about Petitioner and his juvenile record. *Id*.

James Hall, a juvenile probation officer who worked on Petitioner's case in 2000, also testified. *Id*. at 60. Mr. Hall recalled meeting with then ASA Estrada and ASA Joan Hughes, who handled adult cases in the State Attorney's office. *Id*. at 70. The meeting was to discuss whether Petitioner's case should remain in the juvenile court or be "direct filed" to adult court. *Id*. at 63, 73-74. The decision was ultimately made to direct file Petitioner's case; however, Mr. Hall did not know who in the State Attorney's Office made that final decision. *Id*. at 70. Once Petitioner's case was direct filed, ASA Hughes was assigned to prosecute the case, and to Mr. Hall's knowledge, she handled everything on that case. *Id*. at 74-75. When asked whether he thought Judge Estrada could fairly judge Petitioner's case since he had prosecuted him before, Mr. Hall replied that he did not know but personally thought Judge Estrada had too much information on Petitioner. *Id*. at 67.

The State called Judge Estrada to the stand. He testified that he had no recollection of ever prosecuting the Petitioner and did not recognize Petitioner at all during his trial. *Id*. at 291. Judge Estrada further testified that he met Petitioner's mother when he was teaching night classes at the local community college, but he did not recall any of his conversations with her. He could not recall whether Ms. Teague spoke to him about Petitioner. *Id*. at 292-95. He remembered her as a good student and knew that she worked at the Public Defender's Office after taking his class. *Id*. at 297. She would occasionally come to his office to get documents signed. *Id*. at 298. He learned Petitioner was Ms. Teague's son when he saw her sitting in the courtroom at either jury selection or during the trial. *Id*. at 297. Although he had no memory of prosecuting Petitioner, Judge Estrada said that as an ASA handling juvenile cases, generally he would make a recommendation about whether a juvenile case should be direct filed to adult court, but the final decision was made by the Office Director *Id*. at 307. Once a case was direct filed, he—as juvenile prosecutor—had no further participation in the case and rarely heard anything about the case thereafter. *Id*. at 313.

Petitioner also presented evidence about his mental health issues. Petitioner testified that for most of his life, beginning in his youth, he has heard crazy voices in his head, and felt that people were his enemies when they were not. *Id*. at 102-03. He remembered very few details about the night of the crime. He recalled being disoriented from a few days prior to the offense until the time he remembered waking up in jail. *Id*. at 119-120. Petitioner speculated that this blackout was due to his mental health history, not to intoxication from drugs because when he was on drugs he felt differently. *Id*. at 121-22. Petitioner's mother, Ms. Teague, testified that Petitioner suffered from mental health issues since his teen years. *Id*. at 15. She said that at times he was paranoid, suicidal, or depressed, and had been diagnosed as bipolar. *Id*. at 16-17, 37. Trisha Drawdy, Petitioner's ex-wife, testified that Petitioner was diagnosed with depression, anxiety, and

bipolar disorder.  *Id*. at 48.  She and Petitioner testified that he started to self-medicate with drugs, including prescription pain pills.  *Id*. at 49.  Ms. Drawdy described Petitioner as previously having episodes where he was manic and jittery, and then lows where he did not want to do anything.  *Id*. at 51, 55.  Petitioner, Ms. Teague, and Ms. Drawdy testified that Petitioner sought and received some treatment for his mental health issues, which included prescription medication.  *Id*. at 15, 48. Petitioner also introduced into evidence his medical records from the Marge Brewster Center. *Id*. at 106-07.

The State called three witnesses in addition to Judge Estrada: ASA Richard Castillo who prosecuted Petitioner's 2010 case; Petitioner's first counsel Robert H. Gray; and Petitioner's trial counsel Leighton G. Morse.

ASA Castillo testified about the facts leading to Petitioner's arrest on July 3, 2010.  He testified as to how the officers located and identified the Petitioner as the person who entered Ms. Sanchez's vehicle that day.  *Id*. at 187-91.  ASA Castillo also testified about the evidence he presented at trial.  He testified that the State had "an enormous amount of evidence" against Petitioner, even without the taped statement Petitioner tried to suppress.  *Id*. at 193. Among this evidence was Ms. Sanchez's testimony, the video of the parking lot, the gun that was found, and the police dog that was able to lead the police directly from the crime scene to Petitioner.  *Id*. at 193-94.  ASA Castillo further testified that he had the opportunity to observe Petitioner at trial and had no reason to think Petitioner was incompetent or needed to be evaluated for competency. *Id*. at 201-04.

Attorney Gray testified that Judge Estrada was assigned to Petitioner's case during his representation, and Petitioner or his mother raised the issue of whether Judge Estrada could be fair since he had prosecuted Petitioner before and taught Petitioner's mother.  *Id*. at 223-224.  He could

not remember whether it was Petitioner or Ms. Teague who brought the issues his attention, however. *Id*. Attorney Gray recalled that there were conversations about whether Judge Estrada presiding over the trial would be problematic or beneficial for Petitioner. *Id*. Attorney Gray thought Judge Estrada had a great deal of respect for Ms. Teague. *Id*. Further, Attorney Gray was familiar with the other judges in the county who might have taken over the case if Judge Estrada was recused and believed Judge Estrada would be a better choice than the alternatives. *Id*. at 224-25. Attorney Gray did not recall Petitioner directing him to file a motion to recuse Judge Estrada. Attorney Gray testified that if Petitioner had done so, Gray would have filed the motion. *Id*. at 225.

Attorney Gray also testified about his decision to request a mental health evaluation for Petitioner. *Id*. at 227-28. He explained that he retained Dr. McClane to evaluate Petitioner's sanity, provide a basis for the motion to suppress and explore mitigation arguments for sentencing. *Id*. Dr. McClane also evaluated Petitioner for competency, reporting that Petitioner passed the competency screen test with a perfect score. *Id*. at 234. Prior to the evaluation, Attorney Gray provided Dr. McClane with discovery materials and a letter from Julia Jankowski, a certified mental health counselor. *Id*. at 229. Attorney Gray testified that although Petitioner "was in pretty bad shape" when initially arrested because he had "been on a several-day drug binge," once that subsided Petitioner seemed to Attorney Gray to be an intelligent young man. *Id*. at 234. Attorney Gray had no concerns about Petitioner's competency. *Id*.

Attorney Morse testified that by the time he took over the case, it had been pending for "some time." Attorney Morse had only 34 days to prepare the case for trial. *Id*. at 270. When they learned that Judge Estrada would preside instead of Judge Cowden, Petitioner told Attorney Morse that he wanted to file a motion to recuse Judge Estrada because he had prosecuted Petitioner

as a juvenile. *Id*. at 250. Petitioner did not believe he could get a fair trial from Judge Estrada. Attorney Morse considered filing a motion to recuse but made a "tactical decision" not to do so after considering what he knew about the judges who might try the case if Judge Estrada was recused. *Id*. at 252-60, 274-75. Attorney Morse had no concerns about Petitioner's competency and saw no basis to have Petitioner examined for legal insanity. *Id*. at 261-63. It seemed to Attorney Morse that Petitioner knew what he was doing when the crime was committed. *Id*. at 263. Regarding his right to testify, Attorney Morse told Petitioner several times that he was entitled to speak to the jury but was not obligated to do so. *Id*. at 263-64. Attorney Morse advised Petitioner not to testify because doing so would not help Morse's defense argument that Petitioner was not the person who committed the offense. *Id*. Attorney Morse was afraid Petitioner would take the stand and say he was sorry for what he did and become a good citizen. *Id*. at 268. Attorney Morse could not say whether Petitioner also wanted to testify about his mental health. *Id*. at 269.

After the hearing, at the postconviction court's request, the parties submitted written closing arguments. DE 7-18 and DE 7-19.

### E.  3.850 Ruling and Appeal

On January 13, 2017, Judge Raiden denied Petitioner's 3.850 motion on its merits. DE 7-20. Petitioner subsequently filed a motion for hearing (DE 7-21), which Judge Raiden denied as well. DE 7-22. On March 9, 2018, the Second District Court of Appeal (DCA) *per curiam* affirmed denial of Petitioner's request for relief (DE 7-27) and issued a Mandate on June 27, 2018 (DE 7-28).

### F.  Federal Habeas Petition

Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254 on November 7, 2018.

## **TIMELINESS**

Both parties agree that the petition now pending before this Court is timely.  This Court therefore accepts the Section 2254 Petition as timely filed.

## **EXHAUSTION**

The exhaustion doctrine precludes a state prisoner from seeking federal habeas relief before he has fairly presented his constitutional claims in state court and exhausted available state court remedies.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 844 (1999); Title 28 U.S.C. § 2254(b).  Both the factual substance of a claim and the federal constitutional issue, itself, must have been expressly presented to the state court to achieve exhaustion for purposes of federal habeas corpus review.  *Baldwin v. Reese*, 541 U.S. 27 (2004).  A claim must be presented to the highest court of the state to satisfy the exhaustion requirement.  *O'Sullivan*, 526 U.S. at 845.  In a Florida non-capital case, this means the applicant must have presented his claims in a district court of appeal. *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).  Exhaustion may be accomplished on direct appeal.  If not, in Florida, it may be accomplished by the pursuit of a Rule 3.850 motion and the appeal of its denial.  *Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979).

Following a review of the record, the undersigned finds that Petitioner has met the exhaustion requirement. Petitioner raised the four claims at issue in his 3.850 Motion, all of which the state court denied.  DE 7-20.  The Second DCA subsequently affirmed that denial on appeal. DE 7-27.  Thus, Petitioner has successfully exhausted his state court remedies in accordance with Section 2254.

## STANDARDS OF REVIEW

### A.  Standard Under the Antiterrorism and Effective Death Penalty Act

Petitioner's federal habeas petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Title 28 U.S.C. § 2254(a) permits a federal court to issue "a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" if that custody is "in violation of the Constitution or laws or treaties of the United States."  The issuance of a writ is limited, however, by the purpose of AEDPA, which is "to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction."  *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (internal quotations and citations omitted).  The AEDPA establishes a formidable barrier to state prisoners seeking federal habeas relief because it is based on the principle that "state courts are adequate forums for the vindication of federal rights."  *See Downs v. Sec'y, Fla. Dep't of Corrs.*, 738 F.3d 240, 256 (2013).

Section 2254 applies at the end of a greater course of judicial review.  Section 2254(d) assumes that the Petitioner already exhausted his claims using the state's postconviction avenues of relief to obtain an adjudication on their merits.  The Eleventh Circuit directs the focus of inquiry to the last merits adjudication by the state court.  As applied to this case, that is the unwritten PCA opinion that Florida's Second DCA rendered to affirm the denial of Petitioner's rule 3.850 postconviction motion (DE 7-27).   Even though the PCA adjudication is unwritten and thus gives no explanatory basis, it still counts as a merits determination, and it still is entitled to deference. *See Reed v. Sec'y, Fla. Dep't of Corrs.*, 767 F.3d 1252, 1261 (11th Cir. 2014).

While the deference remains, the fact that the Second DCA offered no reasons for the affirmance means the reviewing federal court must "look through" to the last adjudication that

does provide a relevant rationale.  *See Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).  As applied

here, that means this Court looks through to Judge Raiden's Order Denying [Petitioner]'s Motion

for Postconviction Relief that was filed on January 13, 2017.  (DE 7-20).  This Court assumes that

the appellate court adopted Judge Raiden's reasoning and rationale.  *Wilson*, 138 S. Ct. at 1192.

The next step in the analysis is to identify the legal basis that entitles the Petitioner to

habeas corpus relief.  That is, to identify the constitutional or federal law that was violated.  Section

2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State Court proceeding.

28 U.S.C.A. § 2254.

Thus, the first part of Section 2254(d)(1) asks whether the state court's denial was "contrary

to … clearly established Federal law, as determined by the Supreme Court of the United States."

*Id*. The phrase "clearly established Federal law" refers to the holdings, as opposed to the dicta, of

the Supreme Court's opinions in existence when the state court decided the postconviction claims.

*See Downs*, 738 F.3d at 256-57 (adding that it includes a binding circuit court decision that says

whether the particular point in issue is clearly established Supreme Court precedent).  For a claim

based on the ineffective assistance of counsel, for example, the governing standard comes from

the Supreme Court's seminal *Strickland v. Washington*, 466 U.S. 668 (1984) opinion. The phrase

"contrary to" means that the state court decision contradicts the Supreme Court on a settled question of law or holds differently than the Supreme Court on a set of materially indistinguishable facts. *See Downs*, 738 F.3d at 257. A state court's decision can be contrary to the governing federal legal standard either in its result (the denial of relief) or in its reasoning.

The second part of Section 2254(d)(1) asks the reviewing federal court to determine whether the state court's denial "involved an unreasonable application of" clearly established federal law. An unreasonable application of federal law is not the same as a merely incorrect application of federal law. *See Downs*, 738 F.3d at 257. It tests whether the state court's application of the legal principle was objectively unreasonable in light of the record before the state court at the time. An objectively unreasonable application of federal law occurs when the state court identifies the correct legal rule but unreasonably applies, extends, or declines to extend it to the facts of the case. *See Putnam v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).

Section 2254(d)(1) tests the legal correctness of the state court's decision, but it does so through a highly deferential lens. The degree of error must be substantial and beyond dispute. The state court's decision survives Section 2254(d)(1) review so long as some fair-minded jurists could agree with the state court, even if others might disagree. *See Downs*, 738 F.3d at 257.

While subsection (1) of Section 2254(d) tests the legal correctness of the state postconviction court's denial of relief against controlling federal case law, subsection (2) of Section 2254(d) sets forth the standard by which a federal court reviews the state postconviction court's findings of fact. Section 2254(d)(2) asks whether the state postconviction court based its denial "on an unreasonable determination of the facts" based on the evidence before it at the time. As with the Section 2254(d)(1) legal analysis, a reviewing federal court is to consider the state court's findings of fact through a deferential lens. The state court's finding of fact is not

unreasonable just because the reviewing federal court would have reached a different finding of fact on its own. So long as reasonable minds might disagree about the finding of fact, the state court's finding stands. *See Downs*, 738 F.3d at 257. Indeed, the state court's fact determinations are presumed to be correct. Section 2254(e)(1) places the burden on the Petitioner to rebut that "presumption of correctness by clear and convincing evidence." Even if the state postconviction court did make a factual error its decision still should be affirmed if there is some alternative basis sufficient to support it. *See Pineda v. Warden*, 802 F.3d 1198 (11th Cir. 2015).

Obviously then Section 2254(d) creates a standard of review that is highly deferential to the state court's denial of the claim. The reviewing federal court must give the state postconviction court the benefit of the doubt and construe its reasoning towards affirmance. *See Lynch v. Sec'y, Fla. Dep't of Corrs.*, 776 F.3d 1209 (11th Cir. 2015). To warrant relief under Section 2254(d), the Petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This is the degree of error the Petitioner must show before this Court may override the state postconviction court's decision and overturn the finality of the conviction and sentence.

## B. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. *Strickland*, 466 U.S. at 684-85. Defendants in state court prosecutions have such right under the Fourteenth Amendment. *Minton v. Sec'y, Dep't of Corrs.*, 271 F. App'x 916, 918 (11th Cir. 2008). When assessing counsel's performance under *Strickland*, the Court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of

reasonable professional judgment." *Strickland*, 466 U.S. at 690.  "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  Counsel is not ineffective for failing to raise non-meritorious issues.  *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001).  Counsel is also not required to present every non-frivolous argument.  *Dell v. United States*, 710 F.3d 1267, 1282 (11th Cir. 2013).

To prevail on a claim of ineffective assistance of counsel, Petitioner must demonstrate: (1) that his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness; and (2) that he suffered prejudice as a result of that deficient performance.  *Strickland*, 466 U.S. at 687-88.

To establish deficient performance, Petitioner must show that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence.  *Id.* at 690; *see Cummings v. Sec'y for Dep't of Corrs.*, 588 F.3d 1331, 1356 (11th Cir. 2009) ("To establish deficient performance, a defendant must show that his counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place.").  A court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*), *cert. den'd*, 531 U.S. 1204 (2001).  There are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel has in making tactical decisions.  *Id.* at 1317. The test for ineffectiveness is not whether counsel could have done more; perfection is not required.  Nor is the test whether the best criminal defense attorneys might have done more.  *Id.* at 1316.  Instead, to overcome the presumption that assistance was adequate, "a petitioner must

'establish that no competent counsel would have taken the action that his counsel did take.'" *Hittson*, 759 F.3d at 1263 (quoting *Chandler*, 218 F.3d 1305 at 1315).

Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id.*  A court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of the prongs.  *Id.* at 697.

Further, a federal court reviewing a state postconviction court's determination does not apply *Strickland de novo*, "but rather, through the additional prism of [Section 2254(d)] deference."  *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1126 (11th Cir. 2012).  "Thus, under this doubly deferential standard, the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  And if, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of *Strickland* was not unreasonable and [Section 2254(d)] precludes the grant of habeas relief."  *Id.* (internal citation omitted); *but see Evans v. Sec'y, Dep't of Corrs.*, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (*en banc*) (Jordan, J., concurring) (explaining that double deference to a state court's adjudication of a *Strickland* claim applies only to *Strickland's* performance prong, not to the prejudice inquiry). "This 'double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'"  *Id.*  (quoting *Evans v. Sec'y, DOC, FL*, 699 F.3d 1249, 1268 (11th Cir. 2012)).

## **DISCUSSION**

Petitioner raises four grounds for relief: (1) whether counsel was ineffective for failing to file a motion to recuse Judge Estrada; (2) whether counsel was ineffective for failing to adequately represent Petitioner at his motion to suppress hearing; (3) whether counsel was ineffective for failing to adequately investigate and present an insanity defense at trial; and (4) whether counsel was ineffective for misadvising Petitioner about his insanity defense, thereby causing him to forego his right to testify.  After reviewing the pleadings and evidence of record, for the reasons stated herein, this Court recommends that the Petition be denied as to all four claims.

### A.  **Claim 1**

Claim 1 alleges that trial counsel rendered ineffective assistance of counsel by failing to file a motion to recuse Judge Estrada. DE 1-1 at 6-13.  The law is clear that *Strickland* is the appropriate standard for analyzing a claim of ineffective assistance of counsel based on counsel's failure to move to disqualify a trial judge.  *Thompson v. State*, 990 So.2d 482, 489 (Fla. 2008).

Petitioner argues that his lawyer should have filed a motion for Judge Estrada to recuse from his case because he had prosecuted Petitioner before.  Petitioner was arrested two times in his life prior to his arrest in the instant case.  First, at the age of 14, he was arrested for spray painting property and charged with criminal mischief.  *Id*. at 91-92.  At the time, Judge Estrada was a prosecutor handling juvenile cases for the State Attorney's Office.  *Id*. at 291. Then ASA Estrada prosecuted Petitioner's case.  *Id*. at 93. A few years later in 2000, Petitioner was charged with armed burglary of a dwelling at the age of 17.  *Id*. at 92.  Since Petitioner was still a juvenile, the case was assigned to then ASA Estrada.  ASA Estrada did not remain on the case, however, because it was "direct filed" in adult court based in part on ASA Estrada's recommendation.  *Id*. at 69-71, 307.  At that point another prosecutor—ASA Hughes—handled the case.  *Id*. at 313.

ASA Estrada had no further involvement.  Petitioner was charged with armed burglary of a conveyance and armed robbery in the instant case approximately ten years later.

When Petitioner's case was initially assigned to Judge Estrada, he told his first lawyer – Attorney Gray – to have Judge Estrada recused because he had previously prosecuted Petitioner twice.  Petitioner feared that Judge Estrada would want to "throw the book at him" for getting into trouble a third time. *Id* at 224-25. The issue soon became moot, however, because the case was reassigned to Judge Cowden.  When the case returned to Judge Estrada on the day of trial, Petitioner told his trial counsel – Attorney Morse – to file a motion to recuse Judge Estrada.  *Id*. at 251.  Morse considered filing the motion but decided not to do so after weighing several factors. *Id*.  Specifically, Morse believed they had the best chance of getting favorable rulings with Judge Estrada.  He felt that Judge Estrada would be more receptive to the defense's legal arguments than the other judges who might get assigned to the case.  *Id*. at 254.  He believed they could benefit from what he perceived to be a strained working relationship between Judge Estrada and ASA Castillo.  *Id*. at 257-58.  Attorney Morse testified that ASA Castillo indicated to him that he thought Judge Estrada was an idiot.  In turn, Attorney Morse felt that Judge Estrada felt freer to criticize the prosecution when ASA Castillo was the prosecutor. He was also concerned that Judge Cowden might take the case back and try it herself if he filed a motion to recuse Judge Estrada.  *Id*. at 254-55.  This concerned Morse because Judge Cowden seemed to have "an elevated respect for [ASA] Castillo."  *Id*. at 259.  Attorney Morse additionally considered the other judge – Judge Langford – to whom the case might be assigned for trial if Judge Estrada were recused.  Attorney Morse did not believe this was a good outcome because Judge Langford had presided over Petitioner's case in 2000 for armed burglary of a dwelling (which was direct filed to adult court).  *Id*. at 255, 273.  After researching Petitioner's old cases on microfiche, Attorney Morse believed that he "knew

what he was dealing with … with regard to Judge Estrada[,]" but "the only thing [he] knew about Judge Langford was the decisions that he had made in Mr. Schroeder's previous case". *Id*. at 273-74. Taking these factors into account, Attorney Morse made a "tactical decision" not to file a motion for Judge Estrada's recusal. *Id*.   Attorney Morse explained his reasoning to Petitioner, who disagreed with the tactic and still wanted the motion to recuse filed. *Id*. at 257-58.  Attorney Morse said Petitioner ultimately told him to do what he thought was right, but Morse always knew Petitioner did not agree with the decision and wanted Judge Estrada off the case. *Id*. at 256-57, 260-61.

The undersigned considers the issue of prejudice first.  Had Petitioner moved to recuse Judge Estrada, that motion would have been granted. Judge Estrada had previously prosecuted Petitioner once when Petitioner was 14 and was involved in making important prosecutorial decisions about Petitioner's second case a few years later.  Under those circumstances, a motion to recuse should have been granted.  *Goines v. State*, 708 So.2d 656, 661 (Fla. 4th DCA 1998) (granting new trial where defendant's counsel failed to move to recuse judge who previously prosecuted the defendant); *Clayton v. State*, 12 So.3d 1259, 1260 (Fla. 2d DCA 2009) ("The fact that the presiding judge prosecuted a defendant in a previous case is sufficient to support the defendant's claim of a well-founded fear that he would not receive a fair trial before the judge.") As the Florida Fourth District Court of Appeals recognized in *Goines*, "when a legally sufficient basis for judicial disqualification has been shown the law ordinarily does not require that the party seeking disqualification still show that the result would be different before an impartial judge." *Goines*, 708 So.2d at 661.  "The fact there was a sufficient basis for recusal is, in itself, sufficient

to establish prejudice." *Terry Brown v. Julie L. Jones*, Case No. 14-14273 (S.D. Fla. June 15, 2016) (Middlebrooks, J.).[6]

Moreover, Judge Estrada sentenced Petitioner to life imprisonment despite having significant discretion in the sentence he imposed. DE 7-6 at 64-65. Count 1 (armed burglary) had a minimum mandatory penalty of three years' imprisonment up to life imprisonment. Count 2 (armed robbery) had a minimum mandatory penalty of ten years' imprisonment up to life imprisonment. The fact that Judge Estrada imposed the maximum penalty despite the presence of mitigating factors suggests a reasonable probability that the defendant would have received a different sentence under a different judge. *Brown*, at 16 (finding that there was a reasonable probability the defendant would not have received the same sentence with a different judge where the defendant was sentenced to the maximum penalty for each charge). Although the state postconviction court did not reach the issue of prejudice, this Court finds that Petitioner has sufficiently established the prejudice prong of the *Strickland* analysis.

The postconviction court focused on whether trial counsel performed deficiently when he failed to move to recuse Judge Estrada. Regarding this issue, the postconviction court reasoned:

> It is not uncommon for prosecutors to be elevated to the bench. Further, if a judge spent any appreciable time as a prosecutor it is hardly surprising that s/he might encounter persons that s/he previously prosecuted. At least where such facts are brought to the judge's attention *via* a motion for disqualification, it might be wise to consider passing the case. However, in *Schwab v. State*, 814 SO.2d 402 (Fla. 2002), the Supreme Court held that it had been an "informed tactical decision" by counsel not to seek disqualification of the presiding judge despite affidavits submitted *before trial* that might have caused doubt on his impartiality. Strategic decisions of trial counsel have been deemed "virtually unchallengeable." *Downs v. State*, 453 So.2d 1102, 1108 (Fla. 1984). It does not automatically equate to ineffective assistance when counsel makes "strategic decisions that, in hindsight, did not work to the defendant's advantage." *Souffrant v. State*,

---

[6] The fact that Petitioner's mother was a former student of Judge Estrada and was known to Judge Estrada through her work at the Public Defender's Office did not show prejudice because Petitioner would not have a well-founded fear of bias based on those facts.

994 So.2d 407, 410-1 (Fla. 3d DCA 2008).  It cannot escape the Court's notice that not one, but two experienced defense attorneys expressed confidence in Judge Estrada's abilities and were not concerned about his impartiality when handling the case of an individual he prosecuted many years before, assuming he remember ed that person at all.  Based on this analysis the Court finds that Ground One is without merit.

DE 7-20 at 4 (emphasis in original).

The postconviction court found that Petitioner's claim failed because Attorney Morse's decision was a tactical one based on strategic considerations.  Petitioner contends that the state court's finding is based on an unreasonable determination of the facts in light of the evidence presented at the evidentiary hearing. According to Petitioner, the evidence showed that trial counsel's decision was "unreasonable and not strategic at all."  DE 1-1 at 9.

Having reviewed Attorney Morse's testimony closely, this Court agrees with the postconviction court's findings as to counsel's performance. The evidence shows that Attorney Morse made a strategic decision not to seek Judge Estrada's recusal.  As previously described, Morse considered what he knew about Judge Estrada and compared it with what he knew about other judges who might handle the case if Judge Estrada were recused. DE 7-17 at 250-55.  He then made a tactical decision to stay with Judge Estrada.  *Id*.  Strategic decisions by counsel are presumed to be sound.  *Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1240 (11th Cir. 2010).

Petitioner argues that Attorney Morse's reasons for not moving to recuse Judge Estrada were not sound or in Petitioner's best interest.  Regarding Judge Cowden trying the case, Petitioner says "she would not have been placed back on the case" because "she was already presiding over another trial."  DE 1-1 at 11.  Yet Attorney Morse testified, and the undersigned finds it reasonable to believe, that if Judge Estrada had recused, Judge Cowden very well might have taken the case back to try it herself – either then or at a later date.  Consequently, this argument is not persuasive.  Next, Petitioner says considerations of one judge potentially being more "state-friendly" than

another are irrelevant because the evidence was strong for the state anyway and not favorable to the defense.  Thus, Petitioner argues that the judge's predisposition would not have changed the jury's verdict.  This argument is also unavailing, however, because the issue is not whether Petitioner's *trial* would have turned out differently but rather whether his *sentence* would have changed.  It was not unreasonable for Attorney Morse to think that having a defense friendly judge could impact that judge's willingness to accept or reject the State's arguments at sentencing.  As for Judge Langford, Petitioner says Attorney Morse's reasoning was unsound because a stronger case can be made that a judge who previously prosecuted a defendant may be biased than a judge who simply presided over a defendant's prior case. DE 1-1 at 12. The problem with this argument is that Petitioner's characterization of the evidence adduced at the hearing on this point is incorrect. The evidence from the hearing showed Judge Estrada prosecuted Petitioner's first case of criminal mischief when Petitioner was 14 (*Id*. at 93); he did not prosecute Petitioner's case before Judge Langford for armed burglary.  *Id*. at 74. His only role in the armed burglary case was to recommend whether it should be direct filed in adult court.  *Id*. at 69, 311. Once that was done, the case was handled by ASA Hughes, (*Id*. at 75), and Judge Estrada had no further involvement.  *Id*. at 313. Thus, this is not a situation of weighing the judge who prosecuted Petitioner for armed burglary against the judge who sentenced him for that crime.  It was not unreasonable for Attorney Morse to think that Judge Langford, having previously sentenced Petitioner for virtually the same dangerous criminal conduct as that charged in the instant case, might be less favorable than Judge Estrada, who previously prosecuted him for spray-painting at age 14, and recommended that his second juvenile case be filed in adult court a few years later.  Attorney Morse had the benefit of interacting with the client, opposing counsel, and Judge Estrada.  *Premo v. Moore*, 562 U.S. 115, 122 (2011).  He had "insights borne of past dealings with the same prosecutor [and] the court."

*Id*. at 126.  His decision about how to navigate the circumstances given the players involved did not fall outside the wide range of professional competence.  "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000).  Thus, the undersigned defers to the postconviction court's factual finding that Attorney Morse's decision not to file a motion to recuse was a strategic decision.  *See Ferrell v. Hall*, 640 F.3d 1199, 1223 (11th Cir. 2011) (quoting *Provenzano v. Singletary,* 148 F.3d 1327, 1330 (11th Cir.1998) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." (internal quotations omitted)).

This case is distinguishable from *Brown v. Jones*, Case No. 14-14273-DMM (S.D. Fla. June 15, 2016), a case from this district on which Petitioner relies.  There, the District Court granted a defendant's Section 2254 petition alleging ineffective assistance of counsel based on counsel's failure to file a motion to recuse Judge Estrada. Judge Estrada had previously prosecuted that defendant on multiple occasions when he was an ASA. One of the defendant's attorneys testified at the 3.850 hearing that defendant asked her to move for Judge Estrada's recusal.  She did not do so, however, because she mistakenly believed that Judge Estrada's prior prosecution of her client did not constitute grounds for recusal.  DE 19 at 5. Thus, there was no question in *Brown*, that the lawyer's performance was deficient.  *Id*. at 12-13 (quoting *Hardwick v. Crosby*, 320 F,3d 1127, 1163 (11th Cir. 2003) (holding that "a tactical or strategic decision is unreasonable if it based on a failure to understand the law[.]").  Here, however, Attorney Morse's decision not to file a motion to recuse was not based on a misunderstanding of the law.  Rather, it was based on strategic and tactical considerations that Attorney Morse outlined in detail at the 3.850 hearing.  Although

counsel's strategy did not turn out to have much benefit for his client, this Court cannot say it was deficient or, more precisely, that the state court's finding that it was not deficient is unreasonable. The District Court in *Brown* found both deficient performance and prejudice.  Here, while Petitioner has shown prejudice, he has not demonstrated deficient performance.  Because a petitioner must satisfy both prongs of *Strickland* to show ineffective assistance of counsel, *Ward v. Hall*, 592 F.3d 1144, 1163 (11th Cir. 2010), Claim 1 must fail.

### B.  Claim 2

Claim 2 alleges that Attorney McDermott was ineffective in handling Petitioner's motion to suppress for two reasons.  First, he failed to provide Dr. McClane with medical records documenting Petitioner's mental health issues, which would have supported a claim of insanity. Second, Attorney McDermott failed to call Julia Jankowski, a certified mental health counselor who treated Petitioner after his arrest, as a witness during the suppression hearing.  Petitioner says Ms. Jankowski's testimony would have supported his claim that he was unable to intelligently waive his *Miranda* rights.

The postconviction court reviewed Petitioner's medical records and found that they would not have enhanced Dr. McClane's testimony or made the judge presiding over the suppression hearing more likely to grant Petitioner's motion to suppress. DE 7-20. The undersigned agrees. Dr. McClane may not have had the medical records, but he evaluated Petitioner himself before providing his opinion at the hearing on Petitioner's motion to suppress.  In addition to reviewing information provided to him by Attorney Gray – which included the letter from Ms. Jankowski – Dr. McClane also interviewed Petitioner for two hours and conducted his own mental health tests

and exam.  He concluded that Petitioner had mental health challenges,[7] and if Petitioner had bipolar disorder or post-traumatic stress disorder (as suggested by some of the mental health records) that likely contributed to his addiction problems but not necessarily to his actions at the time of the offense.  DE 7-3 at 84.  Since Dr. McClane identified Petitioner's mental health diagnoses in the course of his own examination, the mental health records, which were from two years prior to Petitioner's arrest, would have served only to confirm Dr. McClane's findings in that regard. Ultimately, Dr. McClane recommended that Petitioner was not competent to waive his *Miranda* rights.  The suppression court rejected Dr. McClane's conclusion.  Petitioner has not shown how medical records from BayCare Behavioral Health Center would have done anything to change that result.

As to Ms. Jankowski, the undersigned finds, as the postconviction court implicitly found, that it was not necessary for Ms. Jankowski to testify. The court noted that although Ms. Jankowski assessed somewhat more extreme findings than Dr. McClane, like Dr. McClane, she attributed most of Petitioner's problems to chronic substance abuse. DE 7-20 at 7. Further, Dr. McClane testified that he received and considered Ms. Jankowski's letter in rendering his opinion.  Thus, at least to some degree, her testimony would have been cumulative of what was already presented through Dr. McClane.  In addition, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc); *see also United States v. Long*, 674 F.2d 848, 855 (11th Cir. 1982) ("This Court will not second-guess tactical decisions of counsel

---

[7] Dr. McClane's diagnostic impression were as follows: Number one, chronic severe drug abuse, mainly oxycodone and to a lesser extent methamphetamine. Number two, personality disorder with antisocial traits. Number three, probable severe intoxication with methamphetamine at the time of the offense. And then a few others. Rule out bipolar disorder… [r]ule out post-traumatic stress disorder based on a very traumatic early life. And [] ADHD diagnosed in childhood." DE 7-3 at 82.

in deciding whether to call certain witnesses."). The postconviction court's decision was not an unreasonable application of the law or determination of the facts. As a result, Claim 2 necessarily fails.

### C. Claim 3

In Claim 3, Petitioner argues that Attorney Morse was deficient for failing to adequately investigate and present an insanity defense. In support, Petitioner relies on his own testimony at the 3.850 hearing, medical records from his time as a patient in a mental hospital, and testimony from his family members. Petitioner testified that he had been diagnosed with several mental health disorders prior to the crime, he could not remember many specifics about what happened during the offense, and that he was disoriented in the days leading up to the offense. DE 7-17 at 115-22. Petitioner's family members testified about Petitioner's struggle with drug use and his history of mental health problems.

The facts do not support Petitioner's contention that insanity was a viable defense for him, however. Evidence adduced at trial and during the suppression hearing shows Petitioner's conduct while committing the crime and directly afterwards did not suggest insanity. The victim, Ms. Sanchez testified that when Petitioner entered her car, he was very calm and articulate when telling her that he was not going to hurt or rape her, and that he just needed her to drive. DE 7-5 at 66-68. When Ms. Sanchez escaped and ran from the car, Petitioner fled. *Id*. at 96. Later, while being questioned by law enforcement, Petitioner gave rational answers. He told them he had been trying to get out of Sebring, Florida that day. *Id*. at 162. This, paired with his testimony at the evidentiary hearing about his need to meet up with someone out of town who could help him, suggests that he was operating intentionally and had a conscious plan to hitch a ride. DE 7-17 at 116-17. When law enforcement began to question him specifically about what happened at the Walmart and the

crime that was committed, however, he declined to answer more questions until he had "a clear head". *Id.* at 163.  This shows he was aware of the consequences of discussing the incident and was acting strategically.  The officer interviewing him found Petitioner's thought processes to be "correct and fine and accurate."  DE 7-3 at 73. Petitioner knew where he was and what was going on, at one point telling an officer at the hospital that he "wanted to go to jail."  *Id.* at 56.  He declined medical treatment at the hospital that night, *id.* at 63, and there is no evidence to suggest that any medical professionals at the hospital had concerns about his ability to competently do so.  Further, none of the attorneys who interacted with Petitioner during the 18 months his case was pending—including the two defense lawyers who testified at the 3.850 hearing and the prosecutor—saw any evidence suggesting Petitioner was mentally incompetent or unstable such that an insanity defense should be pursued.  DE 7-17 at 201-04, 235, 261-62. To the contrary, all three attorneys testified that they saw nothing from Petitioner that provided a reason to question his sanity or think an insanity defense might succeed despite having multiple opportunities to observe him.

The postconviction court rejected Petitioner's claim that his trial lawyer was deficient for not arguing legal insanity.  Dr. McClane was hired by Petitioner's first lawyer, Attorney Gray, in part to examine Petitioner's sanity.  DE 7-20 at 6. Dr. McClane concluded that Petitioner's ability to appreciate the nature and conduct of his actions and their wrongness was grossly impaired during the crime by intoxication.  *Id.* at 7. This, the postconviction court pointed out, was different from a finding of legal insanity.  *Id.* (citing *Evans v. State*, 946 So.2d 1 (Fla. 2006); *id.* ("Mere diminished capacity following alcohol or drug abuse is not a legal defense and counsel cannot be faulted for failing to present such a defense.").  The postconviction court observed that nothing in the medical records Petitioner provided at the 3.850 hearing supported an insanity defense.  Even

the report by Ms. Jankowski, who diagnosed Petitioner with more extreme mental health issues than Dr. McClane did, attributed most of Petitioner's problems to chronic drug abuse.  DE 7-20 at 7.  The court considered the testimony of Petitioner's family members, who described his mental health history.  Their testimony merely confirmed what was already shown in the medical records and expert's conclusions, however – that is, that Petitioner has a history of mental health problems. The court said their testimony did not "establish any particular likelihood that an insanity defense could have been constructed." *Id.* "Instead, much as mental illness does not always equate to competency to stand trial, neither does it always mean that the mentally ill individual is insane as that term is defined in law, *viz.*, incapable of distinguishing right from wrong due to a mental disease or defect." *Id.* at 7.[8]

The postconviction court's decision is not an unreasonable application of *Strickland*. Attorney Morse decided not to raise insanity based on the facts and circumstances of the case, and his own impression that Petitioner knew what he was doing when he committed the crime.  DE 7-17 at 264.  Attorney Morse saw no factual basis to support raising an insanity defense or sending Petitioner for another insanity evaluation.  *Id.* at 277-79.   Instead of arguing insanity (which the facts did not support), Attorney Morse decided to challenge identity, that is, whether law enforcement found and arrested the right person for the crime.  *Id.* at 265, 277-79.  Although that too was an uphill battle factually, Attorney Morse believed it was more likely to succeed than an insanity defense.  *Id.*

 "[N]o absolute duty exists to investigate particular facts or a certain line of defense.  Under *Strickland*, counsel's investigation need only be reasonable to fall within the wide range of

---

[8] In addressing another claim not raised in this Petition, the postconviction court also noted Dr. McClane's finding that Petitioner was competent to stand trial.  During the examination, Petitioner related a "logical and coherent" history of his mental health problems, denied any "current psychotic thinking," and appeared to have "intact" judgment when he was not using drugs.  *Id.* at 6-7.

competent assistance." *Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000). Further, "counsel need not always investigate before pursuing or not pursuing a line of defense." *Id*. Rather, "[i]nherent in this duty to conduct a substantial investigation into any … plausible line of dense is the notion that strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Martinez v. Secretary, Fla. Dep't of Corrs.*, 684 Fed. Appx. 915, 923 (11th Cir. 2017) (internal quotations and citations omitted). Nothing in the record supports the notion that Petitioner was legally insane when he committed this offense or that Attorney Morse performed deficiently in this regard. Nor is there any reason to believe an insanity defense would have succeeded, particularly since the evidence shows Petitioner acted normally, communicated coherently, and invoked *Miranda's* protections strategically during and after the offense. Petitioner therefore fails to show deficient performance or prejudice on this issue and Claim 3 must fail.

### D. Claim 4

In Claim 4, Petitioner argues that Attorney Morse was ineffective at trial for misadvising him about the insanity defense, which caused him to waive his right to testify. DE 1-1 at 19-21. As the postconviction court pointed out, Petitioner does not argue that he was kept ignorant of his right to testify. DE 7-20 at 8. Nor can he. Not only did Attorney Morse advise him of his right to speak to the jury, but Judge Estrada did so as well. DE 7-5 at 193-95; DE 7-17 at 263-64, 308-09. Instead, Petitioner seems to argue that he decided not to testify based on wrong information from his lawyer that he did not have an insanity defense. Had he claimed legal insanity and been able to tell the jury about his mental health issues, Petitioner believes the outcome of his case would have been different.

As explained in addressing Claim 3, however, Attorney Morse's advice regarding an insanity defense was not deficient and did not cause prejudice to Petitioner. As the postconviction court stated, no expert witnesses corroborated an insanity defense and there was no evidence, other than Petitioner's self-serving statements, to support an insanity defense. DE 7-20 at 8. For the reasons previously stated, the postconviction court's determination regarding an insanity defense was not unreasonable and Claim 4 must also fail.

## CONCLUSION

Based on the foregoing, this Court recommends to the District Court that the Petition for Writ of Habeas Corpus (DE 1) be **DENIED**.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Jose E. Martinez, the United States District Judge assigned to this case. Failure to file timely objections shall bar the parties from a *de novo* determination by the District Court of the issues covered in this Report and Recommendation and bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988).

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this 6th day of November, 2020.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE